1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NOVA WINES, INC.,

                Plaintiff,

    v.

ADLER FELS WINERY LLC, SAAL
BROWN, INC. dba PACIFIC LICENSING,
GARY SAAL, TOM KELLY STUDIOS, INC.
and DOES 1 THROUGH 10,

                Defendants.

_____/

No. C 06-06149 MHP

**MEMORANDUM & ORDER**
**Re: Plaintiff's Motion for Preliminary**
**Injunction**

On September 29, 2006, plaintiff Nova Wines, Inc. ("Nova" or "plaintiff") brought this action against defendants Adler Fels Winery LLC ("Adler Fels"), Saal Brown, Inc. dba Pacific Licensing ("Pacific Licensing"), Gary Saal ("Saal"), and Tom Kelly Studios, Inc. ("TKS") (collectively "defendants") asserting claims for trademark infringement, trade dress infringement, unfair competition and passing off.  Now before the court is plaintiff's motion for a preliminary injunction.  Having considered the parties' arguments and for the reasons stated below, the court enters the following memorandum and order.

BACKGROUND

Plaintiff Nova Wines, a St. Helena, California winery, does business as Marilyn Wines and sells wines bearing photographs of Marilyn Monroe.  Plaintiff has produced wine under the Marilyn Merlot brand name since 1987, the Marilyn Cabernet brand name since 1993, the Norma Jeane brand name since 1998 and the Velvet Collection brand name since 2004.  Holder Dec. ¶ 6, Exhs. B–E.  The Velvet Collection wine is sold either in 1.5-liter single bottles, or in a three-bottle

1    "premium" set which includes 3-liter, 1.5-liter and 750-milliliter sizes.  Richardson Dec. ¶8, Exh.

2    24.  Since 1989, plaintiff has held an exclusive license to use, on wine, the registered trademark

3    "Marilyn Monroe," as well as common law trademarks for Monroe's name, image and likeness from

4    the Monroe estate.  Howard Dec. ¶ 1, Exh. A; Strasberg Dec. ¶ 2.  Plaintiff has been the sole winery

5    using photographs of Marilyn Monroe on wine for nearly twenty years.  Holder Dec. ¶ 3.

6         Defendant TKS holds copyrights for a series of nude photographs taken of Marilyn Monroe

7    by Tom Kelley, Sr., in 1949.  Saal Dec. ¶ 9, Exh. 6.  While Marilyn Monroe was still alive, she

8    signed a model release consenting to use of her "name, portraits, and pictures and reproductions

9    thereof" of the photographs taken by Kelley.  Id. at ¶ 18, Exh. 12.  Defendant Saal Brown, Inc.,

10   doing business as Pacific Licensing, is the licensing agent for TKS.  Saal Dec. ¶ 2.  In 1999 or 2000,

11   TKS began using the term "Red Velvet Collection" as a trademark for the collection of Kelley

12   photographs.  Id. at ¶ 4; Richardson Dec. ¶ 4, Exh. 21.  In August 2000, TKS applied to register the

13   term "Red Velvet Collection" as a trademark.  Id. at ¶¶ 5–6, Exh. 22.  TKS ultimately abandoned its

14   registration application.  Id.  In September 2003, Pacific filed a fictitious business name statement

15   with the Sonoma County Clerk for the term "Red Velvet Collection" for use in licensing and

16   promoting the Kelley photographs.  Saal Dec. ¶ 5, Exh. 1.

17        In 1999 Pacific first contacted plaintiff to propose licensing the Red Velvet Collection

18   images to plaintiff.  Saal Dec. ¶ 6, Exh. 3.  Pacific and Nova did not enter a license agreement at that

19   time, in part because the Monroe estate and the Tobacco Tax and Trade Bureau ("TTB") would

20   likely not approve of nude photos of Monroe on wine labels.  Id.  In 2003, Pacific worked with the

21   TTB and other consultants to develop a "modesty overlay" to cover Monroe's breasts and buttocks

22   in the Red Velvet Collection photographs, and ultimately did acquire approval for a wine label from

23   the TTB.  Id. at ¶ 8, Exh. 5; see also second Richardson Dec. ¶¶ 1–4, Exh. 28.

24        In 2004 TKS and plaintiff entered a license agreement for use of Red Velvet Collection

25   photos.  Holder Dec. ¶¶ 7–8; Saal Dec. ¶ 9, Exh. 6.  In May and June of 2005, relations between the

26   parties began to deteriorate, and TKS notified plaintiff that it would "establish[] a new licensee for

27   the remainder of the Red Velvet Collection Wine images for the successive years" covered in

28   parties' 2004 agreement.  Saal Dec. ¶ 11, Exh. 9.  At that time, plaintiff received a license from

1   Playboy Enterprises, Inc., for another photograph from the Red Velvet Collection series, which it

2   used for its 2005 and 2006 Velvet Collection releases.  Holder Dec. ¶ 8; see also Saal Dec. ¶ 10.  In

3   September 2005, TKS terminated its license agreement with plaintiff.  Holder Dec. ¶ 10, Exh. 8.  On

4   September 21, 2005 plaintiff informed TKS's counsel that pursuant to a district court judgment

5   against TKS, it would consider the Red Velvet Collection image licensed by TKS part of the public

6   domain, and it would seek return of royalties paid by plaintiff to TKS for use of the image.

7   Richardson Dec. ¶ 8, Exh. 27.  Nova and TKS are currently in arbitration regarding the revocation of

8   the license agreement.

9        After TKS terminated its agreement with plaintiff, it began negotiations with other wineries,

10  including Sonoma Wine Company, to license the Red Velvet Collection images for use on wine

11  labels.  Saal Dec. ¶13.  On February 23, 2006 plaintiff's counsel informed Sonoma Wine Company

12  that it was "the exclusive licensee" of rights in Marilyn Monroe's image and likeness for wine, that

13  Sonoma's release of wine with Marilyn Monroe's image on the label would constitute

14  "infringement" and that plaintiff would take "all appropriate action" in response.  Id. at ¶ 14, Exh.

15  10.  Sonoma Wine Company thereafter withdrew from negotiations with TKS.  Id.

16       In June or July 2006, plaintiff learned that defendant Adler Fels was marketing a wine

17  bearing a photograph from the Velvet Collection.  Redding Dec. ¶ 3; Lindsay Dec. ¶ 5.  Plaintiff's

18  broker, the American Beverage Group, informed Adler Fels that plaintiff was the exclusive licensee

19  of the Monroe estate.  Redding Dec. ¶ 3; Lindsay Dec. ¶ 5.  On July 5, 2006 counsel for plaintiff

20  Wines informed Adler Fels that "no one else" besides plaintiff had "the right to produce wines

21  [bearing Marilyn Monroe's] likeness," and that plaintiff would "aggressively protect" its rights.

22  Lindsay Dec. ¶6, Exh. 13.  Counsel representing Adler Fels, TKS and Pacific Licensing responded

23  on July 7, 2006 that his clients "decline to succumb to your threats."  Id. ¶ 7, Exh. 14.  Defendants

24  subsequently informed plaintiff that they would not release a 1.5-liter bottle in the fall of 2006.  Id.

25  at ¶ 8.  However, defendants' counsel also advised plaintiff that defendants might release  a 750-

26  milliliter bottle using Red Velvet Collection labels in Fall 2006.  Id. at ¶ 8.  This was the last

27  communication between parties before plaintiff filed its complaint on September 29, 2006.

28

In late August 2006 Adler Fels began marketing 750-milliliter bottles of its "Red Velvet Collection . . . ultra-fine wines." Id. at ¶10–11; see also Holder Dec. ¶ 15, Exhs. J–K. Adler Fels invested more than one hundred work hours, and has spent $140,000 in development and production of its initial run of 2,500 cases of the Red Velvet Collection line. Lindsay Dec. ¶ 10. Pre-orders for Adler Fels' Red Velvet Collection line number 2,000 cases. Id. at ¶ 11. Defendants forecast that the Red Velvet Collection will sell 15,000 cases in its first year of release, and estimate revenues totaling four million dollars from these sales. Id. at ¶ 12. Adler Fels originally scheduled October 23, 2006 as its bottling date for the Red Velvet Collection wine, with a ship date of early November 2006. Id. at ¶ 14.

In September 2006 plaintiff received an announcement regarding Adler Fels' Red Velvet Collection wine, urging consumers to place orders by September 15. Holder Dec. ¶ 15, Exhs. J–K. The announcement attached a "mock-up" of the wine bottle for Adler's Red Velvet Collection line. Id. at Exh. K. The mock-up showed a photograph from TKS's Red Velvet Collection series on a bottle of red wine, though not a photo that plaintiff had used on any of its wines. Id.

Plaintiff filed its complaint for trademark infringement, trade dress infringement, unfair competition and passing off on September 29, 2006. Plaintiff served its complaint on defendants on October 5, 2006. That same day, plaintiff filed its ex parte application for a temporary restraining order and motion for preliminary injunction. This court granted a temporary restraining order on October 10, 2006, pending briefing and determination of plaintiff's request for preliminary injunction. On October 26, the court heard arguments regarding plaintiff's request for preliminary injunction.

1    LEGAL STANDARD

2          "A preliminary injunction is a provisional remedy, the purpose of which is to preserve status

3    quo and to prevent irreparable loss of rights prior to final disposition of the litigation." Napa Valley

4    Publ'g Co. v. City of Calistoga, 225 F. Supp. 2d 1176, 1180 (N.D. Cal. 2002) (Chen, Mag. J.) (citing

5    Sierra On-Line, Inc. v. Phoenix Software, Inc., 739 F.2d 1415, 1422 (9th Cir. 1984)).  In light of

6    these considerations, a plaintiff seeking preliminary injunctive relief must demonstrate either: "(1) a

7    likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious

8    questions going to the merits [have been] raised and the balance of hardships tips sharply in [the

9    plaintiff's] favor." Southwest Voter Registration Educ. Project v. Shelley, 344 F.3d 914, 917 (9th

10   Cir. 2003) (en banc) (per curiam) (citing Clear Channel Outdoor, Inc. v. City of Los Angeles, 340

11   F.3d 810, 813 (9th Cir. 2003)); see also Sun Microsystems, Inc. v. Microsoft Corp., 188 F.3d 1115,

12   1119 (9th Cir. 1999).  The components of these two tests, together with the added consideration of

13   the public interest, operate on a sliding scale or "continuum." Southwest Voter Registration Educ.

14   Project, 344 F.3d at 918.  Consequently, "the less certain the district court is of the likelihood of

15   success on the merits, the more plaintiffs must convince the district court that the public interest and

16   balance of hardships tip in their favor." Id. (citation omitted); see also Miller v. California Pac.

17   Med. Ctr., 19 F.3d 449, 456 (9th Cir. 1994) (en banc) (citations omitted).

18         As in any other civil proceeding, the likelihood of success on the merits and the balance of

19   hardships are the critical considerations in determining whether a preliminary injunction should

20   issue in a trademark infringement action.  See, e.g., Dr. Seuss Enters., L.P. v. Penguin Books USA,

21   Inc., 109 F.3d 1394, 1406 (9th Cir. 1997).  To prevail on the merits of a trademark infringement

22   claim, a plaintiff must establish "that the defendant's use of its mark gives rise to a 'likelihood of

23   confusion' in the consuming public." Metro Publ'g, Ltd. v. San Jose Mercury News, 987 F.2d 637,

24   640 (9th Cir. 1993) (quoting E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1290 (9th Cir.

25   1992)).  "Once the plaintiff has demonstrated a likelihood of confusion, it is ordinarily presumed

26   that the plaintiff will suffer irreparable harm if injunctive relief is not granted." Brookfield

27   Commc'ns, Inc. v. West Coast Entm't Corp., 174 F.3d 1036, 1066 (9th Cir. 1999) (quoting Metro

28   Publ'g, 987 F.2d at 640).  Such an injunction may issue even if the plaintiff's mark has not been

5

1   registered with the PTO.  Metro Publ'g, 987 F.2d at 640 (citing New West Corp. v. NYM Co. of

2   California, Inc., 595 F.2d 1194, 1198 (9th Cir. 1979)) ("It is not necessary that a trademark be

3   registered in order for it to qualify for protection under the Lanham Act.").

4

5   DISCUSSION

6   _____Plaintiff seeks protection for the following trademarks or trade dresses for use on wine: the

7   registered trademark "Marilyn Monroe," the common law trademark "Marilyn," the common law

8   trademarks consisting of the images and likenesses of Marilyn Monroe,[1] the common law trademark

9   "Velvet Collection," and the trade dress comprised of "high quality, distinctive photographs of

10  Marilyn Monroe in various poses taken at different times during her career that show her, [sic]

11  beauty, glamour and sex appeal" ("the Marilyn Wines trade dress").  With the exception of "Velvet

12  Collection" and the Marilyn Wines trade dress, plaintiff asserts that these marks are each owned by

13  the Marilyn Monroe estate, which has granted plaintiff an exclusive license to use the marks in

14  connection with wine.  Significantly, plaintiff seeks protection for these marks and dresses *only* as

15  they are used on wine bottles.

16

17  I.      Likelihood of Success on the Merits

18

19  A.      The "Marilyn Monroe" and "Marilyn" Marks

20  As a preliminary matter, defendants assert that plaintiff has no standing to bring infringement

21  claims based on trademarks owned by the Marilyn Monroe estate, as such claims can only be

22  brought by the owner or assignee of the marks.  Defendants' argument in this regard is limited to

23  claims under Section 32 of the Lanham Act (15 U.S.C. section 1114).[2]  The issue is whether

24  plaintiff's status as a licensee of the federally registered trademark "Marilyn Monroe" belonging to

25  the Marilyn Monroe estate confers standing upon plaintiff to bring the infringement claim.

26  Defendants assert that only an assignment can confer such standing.  Courts have held that an

27  exclusive license that amounts to a *de facto* assignment creates standing in the exclusive licensee.

28  See National Licensing Ass'n, LLC v. Inland Joseph Fruit Co., 361 F. Supp. 2d 1244, 1254 (E. D.

6

1  Wash. 2004).  Where the licensor reserves all property rights in the mark, however, the licensee has

2  no standing under Section 1114(1).  Id.  See also Ultrapure Systems, Inc. v. Ham-Let Group, 921 F.

3  Supp. 659, 665 (N.D. Cal. 1996) (Williams, J.) (holding that a licensee lacks standing where the

4  license is non-exclusive or "provisions in the contract indicate that the licensor retains exclusive

5  ownership of the mark").  The license agreement between the Marilyn Monroe estate and plaintiff

6  provides an exclusive license only with respect to the use of the mark on still wines, provides non-

7  exclusive licenses with respect to other wines, and reserves to the estate all rights not explicitly

8  granted.  Holder Dec., Exh. A.  Accordingly, the license is non-exclusive and does not convey a

9  property interest.  Plaintiff therefore lacks standing to assert claims for infringement of the registered

10  "Marilyn Monroe" trademark.[3]

11      Plaintiff also asserts claims based on the common law trademark "Marilyn."  The common

12  first name "Marilyn," standing alone, is likely not a protectable trademark.  Quicksilver, Inc. v.

13  Kymsta Corp., 466 F.3d 749, 760 (9th Cir. 2006) ("Personal names—both surnames and first

14  names—are generally regarded as descriptive terms, which are not inherently distinctive.") (internal

15  quotations and citations omitted).  Presumably, therefore, plaintiff is asserting an interest in the

16  name "Marilyn" as it is represented within the registered trademark comprised of the stylized

17  "Marilyn Monroe" signature.  See Howard Dec., Exh. A.  At first glance it would appear that any

18  rights in the stylized "Marilyn" would be derivative of the rights in the registered "Marilyn Monroe"

19  trademark, and plaintiff would therefore lack standing to assert the "Marilyn" mark as well.  In any

20  case, defendants represent that they have not and do not intend to use the stylized "Marilyn" mark.

21  Because plaintiff can likely assert no interest in the word "Marilyn," and defendants do not intend to

22  use the stylized version of the word, the protectability of the stylized "Marilyn" is moot.

23

24      B.    The "Velvet Collection" Mark

25      Plaintiff claims a common law trademark interest in the term "Velvet Collection" as it

26  applies to wine.  Plaintiff asserts that it has been using this term on its Marilyn Monroe wines since

27  2004.  Defendants assert that this term is derived from the mark "Red Velvet Collection," owned by

28  TKS, and that plaintiff's right to use the term is based solely on the licensing agreement that TKS

1  and plaintiff entered into in May 2004.  This licensing agreement is currently the subject of an

2  arbitration pending elsewhere, and the court is hesitant to reach any conclusions that may influence,

3  conflict with, or otherwise interfere with those proceedings.  For the purposes of this preliminary

4  injunction motion, the court therefore declines to reach the issue of whether plaintiff has a valid

5  interest in the "Velvet Collection" mark.

6       In sum, plaintiff lacks standing to bring claims based on the "Marilyn Monroe" trademark.

7  Regarding the "Marilyn" trademark, plaintiff either lacks standing or the issue is moot based on

8  defendants' representation that it does not and will not use the mark.  Because the court cannot

9  determine the validity of plaintiff's claim regarding the "Velvet Collection" mark, plaintiff is not

10  entitled to protection of that mark for the purposes of this preliminary injunction.  Plaintiff has

11  therefore identified no trademarks for which it is entitled to a preliminary injunction.

12

13      C.    The Marilyn Wines Trade Dress

14       Trade dress involves "the total image of a product and may include features such as size,

15  shape, color or color combination, texture, graphics, or even particular sales techniques."  Mattel,

16  Inc. v. Walking Mountain Prods., 353 F.3d 792, 808 n.13 (9th Cir. 2003) (quoting Two Pesos, Inc. v.

17  Taco Cabana, Inc., 505 U.S. 763, 765 n.1 (1992)).  To state a claim for trade dress infringement,

18  plaintiff must allege: (1) that its claimed trade dress is inherently distinctive or has acquired

19  secondary meaning; (2) that its claimed trade dress is nonfunctional; and (3) that defendant's product

20  creates a likelihood of consumer confusion.  Clicks Billiards, Inc. v. Sixshooters, Inc., 251 F.3d

21  1252, 1258 (9th Cir. 2001).

22

23      1.    Distinctiveness

24       In assessing distinctiveness, courts employ a five-part continuum of increasing inherent

25  distinctiveness.  A trademark or trade dress may be (1) generic, (2) descriptive, (3) suggestive, (4)

26  arbitrary, or (5) fanciful.  Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 9 (2d Cir.

27  1976); see also GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1207 (9th Cir. 2000).  Marks

28  and dresses falling into the latter three categories are entitled to protection without a showing of

UNITED STATES DISTRICT COURT
For the Northern District of California

1    secondary meaning.  Two Pesos, 505 U.S. at 768.  Plaintiff asserts that its trade dress—placing

2    images of Marilyn Monroe on wine bottles—is arbitrary because there is no natural connection

3    between Marilyn Monroe and wine.

4            While not explicitly tied to plaintiff's distinctiveness argument, defendants' arguments

5    regarding the characterization of plaintiff's purported trade dress as merely an "idea or concept" are

6    best addressed in this context.  Defendants assert that placing images of Marilyn Monroe on wine

7    bottles cannot be protected because it is "merely an idea or concept of putting photographs of

8    Marilyn Monroe on a wine label."  Defendants point to the common practice of attaching images of

9    Marilyn Monroe to a wide variety of products as evidence that such a practice cannot be protected as

10   trade dress.

11           Defendants' argument in this regard is unconvincing.  The case upon which defendants rely,

12   Jeffrey Milstein, Inc. v. Greger, Lowlor, Roth, Inc., 58 F.3d 27 (2d Cir. 1995), is distinguishable.

13   The idea in that case was die-cut photographic greeting cards.  Jeffrey Milstein, 58 F.3d at 33.

14   Specifically, the asserted trade dress consisted "solely of common and functional elements such as

15   die-cutting, photographs, and blank white interiors."  Id. at 30.  The court therefore found that the

16   asserted trade dress was a "generalized idea—one that has been applied, and has many applications,

17   to products outside the greeting card context."  Id. at 34.  The court cited other die-cut products as

18   evidence that the plaintiff's trade dress was not subject to protection.  Id.  The trade dress at issue in

19   Jeffrey Milstein pertained only to the shape and design of the product itself rather than any ancillary

20   information that would indicate source.  Granting trade dress protection to the greeting card

21   manufacturer would have improperly granted the manufacturer a monopoly on a particular *type* of

22   greeting card.  Here, the product at issue is wine, not photographs of Marilyn Monroe.  The images

23   of Marilyn Monroe are placed on the labels of wine bottles, a context traditionally devoted to

24   indicating the source of the wine inside the bottle.  This case is therefore similar to Philip Morris

25   Inc. v. Star Tobacco Corp., where the court held that trade dress consisting of the geography of the

26   American West and individual cowboys was inherently distinctive when used in advertising for

27   cigarettes.  879 F. Supp. 379, 383 (S.D.N.Y. 1995).  Likewise, the fact that images of Marilyn

28   Monroe have appeared on other products such as apparel and collectible items does not render

UNITED STATES DISTRICT COURT
For the Northern District of California

1    plaintiff's use of the mark generic, as these uses do not serve the unique source-identifying functions

2    of wine labels.

3          A related argument raised by defendants is the assertion that the mere image or likeness of a

4    famous individual is not subject to protection.  Because plaintiff does not have a trademark in any

5    specific image of Marilyn Monroe, Adler Fels' use of the TKS image on its wine bottle will infringe

6    plaintiff's trade dress only if this trade dress can be construed to consist of the use of *any* image of

7    Marilyn Monroe on wine.

8          Other courts have addressed the use of a famous likeness in trademark and trade dress.  In

9    Pirone v. MacMillan, Inc., 894 F.2d 579, 581 (2d Cir. 1990), the daughters of Babe Ruth objected to

10   the use of photographs of the baseball player in a calendar published by the defendant.  The

11   plaintiffs did not have any ownership interest in the specific photographs included in the calendar,

12   but asserted that the calendar infringed their trademark rights in the image and name of Babe Ruth.

13   Id. at 582.  The court held that "a photograph of a human being, unlike a portrait of a fanciful

14   cartoon character, is not inherently 'distinctive' in the trademark sense of tending to indicate origin."

15   Id. at 583.  The court went on to hold that "[t]he purpose of a trademark is to designate the source of

16   a product and it has no existence apart from the trade in connection with which the mark is

17   employed."  Id. (internal quotations omitted).  Regarding the plaintiffs' claim that they were entitled

18   to protection regarding any use of the Babe Ruth image, the court held that "[i]t cannot be said that

19   every photograph of Ruth serves this origin-indicating function," and therefore there was no basis

20   for liability.  Id.

21         Similarly, in Estate of Presley v. Russen, 513 F. Supp. 1339, 1344 (D.N.J. 1981), the estate

22   of Elvis Presley sought to enjoin the defendant from using "the image or likeness or persona of Elvis

23   Presley or any equivalent . . . on any goods, in any promotional materials, in any advertising or in

24   connection with the offering or rendering of any musical services."  The court held that the estate's

25   claim to all images of Elvis Presley was too broad, but held that "a picture or illustration of Elvis

26   Presley dressed in one of his characteristic jumpsuits and holding a microphone in a singing pose is

27   likely to be found to function as a service mark."  Id. at 1363–64.  The court acknowledged that

28   different forms of the so-called "Elvis Pose"—variations, for example, in the color of the jumpsuit or

10

UNITED STATES DISTRICT COURT
For the Northern District of California

1    the orientation of the face—could all be considered a single "Elvis Pose" service mark.  Id. at 1364.

2    On this point, the court held that " a change which does not alter [a mark's] distinctive

3    characteristics represents a continuity of trademark rights. Thus, where the distinctive character of

4    the mark is not changed, the mark is, in effect, the same and the rights obtained by virtue of the

5    earlier use of the prior form inure to the later form."  Id. (quoting Ilco Corp. v. Ideal Security

6    Hardware Corp., 527 F.2d 1221, 1224 (C.C.P.A. 1976)).

7        Finally, in ETW Corp. v. Jireh Publ'g, Inc., 332 F.3d 915, 918 (6th Cir. 2003), ETW, the

8    licensing agent of Tiger Woods asserted that the inclusion of several original images of Woods on a

9    painting by the defendant infringed ETW's trademark in the likeness of Tiger Woods.  The court

10   held that

11           [i]mages and likenesses of Woods are not protectable as a trademark
             because they do not perform the trademark function of designation.
12           They do not distinguish and identify the source of goods. They cannot
             function as a trademark because there are undoubtedly thousands of
13           images and likenesses of Woods taken by countless photographers,
             and drawn, sketched, or painted by numerous artists, which have been
14           published in many forms of media, and sold and distributed
             throughout the world. No reasonable person could believe that merely
15           because these photographs or paintings contain Woods's likeness or
             image, they all originated with Woods.

16   Id. at 922.  The court further announced the "general rule" that "a person's image or likeness cannot

17   function as a trademark."  Id.

18       Each of these cases is legally and factually distinguishable from the circumstances here.  In

19   each case, the plaintiff was attempting to establish an individual's likeness or image as a trademark,

20   essentially attempting to secure control over all use of the person's likeness whatsoever.  The nature

21   of the mark to be protected and use to be enjoined were both very broad—the plaintiffs sought

22   protection for all likenesses of a particular person, and sought to enjoin the use of those likenesses in

23   all circumstances.  The context in which plaintiff has used the Marilyn Monroe image, combined

24   with the fact that plaintiff's asserted rights derive from trade dress rather than trademark, manifestly

25   distinguishes plaintiff's case from these trademark cases.  While trademarks are rights in gross

26   regarding a particular image, trade dress protects only the general appearance of a particular product

27   or service.  Put another way, the use at issue in this case is not simply the use of the Marilyn Monroe

28

                                                    11

1    image, it is the use of the Marilyn Monroe image *on wine bottles*.  Plaintiff's unique, long-standing

2    practice of placing various images of Marilyn Monroe on its wines has created a recognizable trade

3    dress specifically limited to the sale of wine.  Accordingly, the fact that the trade dress includes a

4    component that is not independently protectable as a trademark does not defeat the validity of the

5    trade dress.  See Jeffrey Milstein, 58 F.3d at 32 ("Although each element of a trade dress

6    individually might not be inherently distinctive, it is the combination of elements that should be the

7    focus of the distinctiveness inquiry.").  It is not merely the Marilyn Monroe image itself, but the

8    consistent and repeated use of the Marilyn Monroe image on a specific product in a specific manner,

9    that constitutes the trade dress.

10        Because the use of Marilyn Monroe images on wine labels is a valid trade dress and there is

11   no natural connection between Marilyn Monroe and wine, the Marilyn Wines trade dress is

12   inherently distinctive.

13

14            2.    Functionality

15        Defendants claim that the Marilyn Monroe trade dress is aesthetically functional.  Because

16   defendants misstate the applicable standard in the Ninth Circuit, this argument warrants little

17   discussion.  The Ninth Circuit recently discussed aesthetic functionality at length in Au-Tomotive

18   Gold, Inc. v. Volkswagen of America, Inc., 457 F.3d 1062 (9th Cir. 2006).  The test for aesthetic

19   functionality is "whether protection of the feature as a trademark would impose a significant non-

20   reputation-related competitive disadvantage."  Id. at 1072.  Defendants' suggestion that the core

21   inquiry in aesthetic functionality is whether "the trade dress is an important ingredient in the

22   commercial success of the product" is therefore incorrect.  In Au-Tomotive Gold, the Ninth Circuit

23   "squarely rejected the notion that 'any feature of a product which contributes to the consumer appeal

24   and saleability of the product is, as a matter of law, a functional element of that product.'"  Id. at

25   1073 (quoting Vuitton Et Fils S.A. v. J. Young Enters., Inc., 644 F.2d 769, 773 (9th Cir. 1981)).

26   Defendants do not assert that they would be placed at a significant competitive disadvantage if they

27   were denied the right to place Marilyn Monroe images on their wine bottles.  The court therefore

28   finds that the Marilyn Monroe trade dress is non-functional.

1

2                 3.      Secondary Meaning

3         Although secondary meaning is not required to protect an inherently distinctive trade dress, a

4 brief discussion of secondary meaning is appropriate given the factors the court must consider in a

5 preliminary injunction inquiry.  Trade dress acquires secondary meaning "when the purchasing

6 public associates the dress with a particular source."  Fuddruckers, Inc. v. Doc's B.R. Others, Inc.,

7 826 F.2d 837, 843 (9th Cir. 1987).

8         Plaintiff asserts that its use of the Marilyn Monroe trade dress has acquired secondary

9 meaning because plaintiff has been using Marilyn Monroe images on its wine bottles for nearly

10 twenty years, and invested substantial amounts in marketing based on the Marilyn Monroe branding.

11 While plaintiff does not submit any consumer data to show actual consumer association between

12 Marilyn Monroe wine labels and Nova wines, the fact that plaintiff has been using Marilyn Monroe

13 prominently on its labels and promotional materials for a substantial period of time—and, indeed,

14 appears to be the only winery to make such use of the Marilyn Monroe image during this

15 time—suggests a strong connection between Marilyn Monroe wine labels and Nova wines.

16         In response, defendants assert that the photographs of Marilyn Monroe are "part of the

17 product itself" rather than a source identifier, relying on Rock & Roll Hall of Fame & Museum, Inc.

18 v. Gentile Productions, 134 F.3d 749 (6th Cir. 1998).  In Rock & Roll Hall of Fame, the defendant

19 was selling posters featuring a photograph of the Rock & Roll Hall of Fame and Museum building,

20 and the plaintiff asserted a trademark interest in the building design.  Id. at 751.  In concluding that

21 the building was "the good itself" and therefore not subject to protection, the Sixth Circuit drew a

22 key distinction that renders the Rock & Roll Hall of Fame case inapplicable to this action:

23                [W]hen we view the photograph in Gentile's poster, we do not readily
               recognize the design of the Museum's building as an indicator of

24                source or sponsorship.  What we see, rather, is a photograph of an
               accessible, well-known, public landmark.  Stated somewhat

25                differently, in Gentile's poster, the Museum's building strikes us not
               as a separate and distinct mark *on the good*, but, rather, as the good

26                itself.

27 Id. at 754 (emphasis in original).  Here, Marilyn Monroe is not the good itself.  The good is the wine

28 inside the bottle, and the Marilyn Monroe image is a mark on the good indicating its source.

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Accordingly, the court finds that plaintiff is likely to prevail on the issue of secondary

2    meaning.[4]

3

4    D.    Likelihood of Confusion

5    To determine whether plaintiff is entitled to injunctive relief regarding its trade dress claim,

6    the central inquiry is whether Adler Fels' use of the asserted dress is likely to cause consumer

7    confusion.  See Brookfield Commc'ns, 174 F.3d at 1053 (quoting Official Airline Guides, Inc. v.

8    Goss, 6 F.3d 1385, 1391 (9th Cir. 1993)) (characterizing the likelihood of confusion inquiry as

9    "[t]he core element of trademark infringement").  A likelihood of confusion exists "when consumers

10   are likely to assume that a product or service is associated with a source other than its actual source

11   because of similarities between the two sources' marks or marketing techniques."  Nutri/System,

12   Inc. v. Con-Stan Indus., Inc., 809 F.2d 601, 604 (9th Cir. 1987) (quoting Shakey's Inc. v. Covalt,

13   704 F.2d 426, 431 (9th Cir. 1983)).  In AMF Inc. v. Sleekcraft Boats, 599 F.2d 341 (9th Cir. 1979),

14   the Ninth Circuit listed eight factors to be considered as part of the consumer confusion inquiry.  Id.

15   at 348-49.  These "Sleekcraft factors" are: (1) the similarity of the marks; (2) the strength of the

16   plaintiff's mark; (3) the relatedness or proximity of the goods; (4) the marketing channels used by

17   each party; (5) the degree of care likely to be exercised by the purchaser; (6) the defendant's intent

18   in selecting the mark; (7) evidence of actual confusion; and (8) the likelihood of expansion of the

19   parties' product lines.  Id.; see also Brookfield Commc'ns, 174 F.3d at 1053–54.  "Likelihood of

20   confusion in the trade dress context is evaluated by reference to the same factors used in the ordinary

21   trademark context."  Vision Sports, Inc. v. Melville Corp., 888 F.2d 609, 616 (9th Cir. 1989).

22   Because plaintiff has only shown a valid interest in its Marilyn Wines trade dress, the court will

23   apply these factors to the asserted trade dress.

24

25    1.    Similarity of the Marks

26   The first Sleekcraft factor, the similarity of the parties' marks, is "the most crucial factor in

27   determining the likelihood of confusion."  Newsguy, Inc. v. Yomtobian, No. C 04-0811 CRB, 2004

28   WL 2944051, at *4 (N.D. Cal. Dec. 20, 2004) (Breyer, J.) (quoting Golden West Fin. v. WMA

14

1   Mortgage Servs., Inc., No. C 02-5727 CRB, 2003 WL 1343019, at *4 (N.D. Cal. Mar. 13, 2003)

2   (Breyer, J.)); see also GoTo.com, 202 F.3d at 1205 (9th Cir. 2000) (noting that "the similarity of the

3   marks [ ] has always been considered a critical question in the likelihood-of-confusion analysis").  In

4   comparing the parties' marks, the court must focus on how each of the marks is perceived by the

5   ordinary consumer in the marketplace.  See Brookfield Commc'ns, 174 F.3d at 1054; Dreamwerks

6   Prod. Group, Inc. v. SKG Studio, 142 F.3d 1127, 1131 (9th Cir. 1998).  The "greater the similarity

7   between the two marks at issue, the greater the likelihood of confusion." GoTo.com, 202 F.3d at

8   1206.

9           Here, Adler Fels' Red Velvet Collection bottle is virtually identical to plaintiff's 2002 and

10  2004 Velvet Collection bottles.[5]  Holder Dec., Exhs. E & K.  The image portion of each label

11  contains only a photograph from the TKS Red Velvet Collection with no text, with "modesty

12  overlays" covering portions of Marilyn Monroe's body.  The poses selected for each label are also

13  strikingly similar.  The noticeable differences are:  (1) Monroe's overall orientation is right-facing

14  on the Nova bottles, and left-facing on the Adler Fels bottle, though in both images she is turned

15  toward the viewer; (2) Monroe has both hands behind her head in the Adler Fels photo, but only one

16  hand behind her head in the Nova photo, though the position and orientation of the arm closest to the

17  viewer is nearly identical in both photos; (3) on the Nova bottle, Monroe's head is tipped back

18  slightly and her face is somewhat more emotionally expressive; and (4) the "modesty overlay" on

19  the Adler Fels bottle is less modest than the overlay on the Nova bottles, leaving more of Monroe's

20  breast visible.  In all other material respects the orientation and position of Monroe's body is the

21  same.  This similarity between Adler Fels' product and existing products bearing plaintiff's trade

22  dress brings this factor squarely in favor of plaintiff.

23

24                  2.      Strength of Plaintiff's Mark

25          The second Sleekcraft factor is the strength of plaintiff's Marilyn Wines trade dress.  The

26  strength of protection afforded to a trade dress is proportionate to the likelihood that the public will

27  remember the mark and associate it with the source of the trademarked goods.  GoTo.com, 202 F.3d

28  at 1207 (citing Kenner Parker Toys Inc. v. Rose Art Indus., Inc., 963 F.2d 350, 353 (Fed. Cir.

1   1992)).  Both the "conceptual" and "commercial" strength of the dress must be considered in this

2   analysis.  Id.  The first of these considerations, the dress' "conceptual strength," involves the

3   familiar classification of trade dress along a spectrum of increasing distinctiveness, in which marks

4   are categorized as generic, descriptive, suggestive, and arbitrary or fanciful.  Id.; see also Brookfield

5   Commc'ns, 174 F.3d at 1058.  As discussed *supra*, there is no natural connection between Marilyn

6   Monroe and wine.  The selection of Marilyn Monroe images for plaintiff's wine labels therefore

7   creates a strong trade dress.  This factor, too, weighs in favor of plaintiff.

8

9                    3.      Relatedness or Proximity of the Goods

10      The third Sleekcraft factor to be considered is the relatedness or proximity of the parties'

11  goods.  This factor reflects the common-sense intuition that the danger of consumer confusion is

12  heightened where goods are related or complimentary.  See E. & J. Gallo, 967 F.2d at 1291 (citing

13  AMF, 599 F.2d at 350).  Here, both plaintiff and defendant sell wines.  The court therefore finds that

14  the close proximity of the parties' products increases the likelihood of consumer confusion.

15

16                   4.      Marketing Channels Used

17      The fourth Sleekcraft factor requires the court to examine the marketing channels that each

18  of the parties uses to sell and advertise its goods or services.  "Convergent marketing channels

19  increase the likelihood of confusion."  Official Airline Guides, 6 F.3d at 1393 (quoting

20  Nutri/System, 809 F.2d at 606).  Similarity of the parties' advertising methods is also considered as

21  part of this inquiry.  Nutri/System, 809 F.2d at 606 (citing Pizzeria Uno Corp. v. Temple, 747 F.2d

22  1522, 1535 (4th Cir. 1984)).

23      The consideration of this factor is necessarily conjectural, as Adler Fels has not begun selling

24  its Red Velvet Collection wine.  The court therefore affords this factor little weight, and does not

25  reach the issue of which party this factor favors.

26

27

28

16

1          5.      Degree of Care Likely to Be Exercised by the Purchaser

2          The next factor to be considered is the degree of care that a consumer is likely to exercise in

3   purchasing the parties' products.  The court views the parties' products from the standpoint of

4   "typical buyer exercising ordinary caution."  Sleekcraft, 599 F.2d at 353 (citing HMH Publ'g Co. v.

5   Lambert, 482 F.2d 595, 599 n.6 (9th Cir. 1973)).  It is thus assumed that sophisticated consumers

6   and buyers of expensive goods will exercise greater care in their purchases, thereby reducing the

7   likelihood of confusion or mistake as to the origin of the goods.  See, e.g., Entrepreneur Media, Inc.

8   v. Smith, 279 F.3d 1135, 1152 (9th Cir. 2002).  Conversely, "[c]onfusion between marks is generally

9   more likely where the goods at issue involve relatively inexpensive, 'impulse' products to which the

10  average, 'unsophisticated' consumer does not devote a great deal of care and consideration in

11  purchasing."  E. & J. Gallo Winery v. Consorzio del Gallo Nero, 782 F. Supp. 457, 464–65 (N.D.

12  Cal. 1991) (Jensen, J.) (citing Grey v. Campbell Soup Co., 650 F. Supp. 1166, 1175 (C.D. Cal.

13  1986)).  As the court observed in Gallo Nero, there is little doubt that wine purchasers typically fall

14  into the latter category of unsophisticated, "impulse" buyers.  Id. at 465; see also Taylor Wine Co. v.

15  Bully Hill Vineyards, Inc., 569 F.2d 731, 734 (2d Cir. 1978) (observing that "the average American

16  who drinks wine on occasion can hardly pass for a connoisseur of wines" and thus "remains an easy

17  mark for an infringer").

18         Plaintiff asserts that even careful consumers are likely to view Adler Fels' Red Velvet

19  Collection as associated with, or a brand extension of, plaintiff's existing line of products.

20  Defendants claim that there is no likelihood of confusion because the Marilyn Monroe images

21  appear on the "back" labels of the respective wine bottles, while the "front" labels contain source-

22  identifying information required by federal law.  Defendants cite 27 C.F.R. section 4.35 in support

23  of this position.  According to defendants, the specificity of the information required by the C.F.R.

24  makes confusion "virtually impossible."

25         This argument is nothing short of absurd.  To begin with, although the C.F.R. lists several

26  requirements regarding the information to be included on wine packaging, the words "front" and

27  "back" appear nowhere in the section cited by defendants.  Rather, the section provides that the

28  required information appear on "A label on each container of American wine."  27 C.F.R. § 4.35(a)

17

(emphasis added).  More importantly, the suggestion that Nova or Adler Fels would go through the trouble of licensing and placing a visually compelling image on their wine bottles just so they could appear on the "back" of the bottle is outrageous.  Consumers purchasing Marilyn Monroe wines are drawn to the image of Marilyn Monroe, not the detailed textual source information on the opposite side of the bottle.  Adler Fels' own promotional announcement regarding its Red Velvet Collection wine contained a photograph not of the purported "front" of its wine bottle, but of the portion of the label consisting entirely of the Marilyn Monroe image.  Holder Dec. ¶ 15, Exhs. J–K.  As a general matter, furthermore, no wine retailer that this court is aware of, no matter how large or small, shelves its wine bottles with the artwork facing the wall.  This is precisely because consumers, in selecting wine, are much more concerned with the distinctive design of the wine label than with the textual information regarding geographic origin, the dangers of alcohol to pregnant women, the presence of sulfides, or any of the other legally required verbiage that appears on the less interesting side of the wine bottle.  Indeed, if 27 C.F.R. section 4.35 were a silver bullet against consumer confusion, there could never be a case of trademark or trade dress infringement in the wine industry.

Accordingly, the court finds that plaintiff is likely to show that the ordinary degree of care exercised by typical wine purchasers will not lead these purchasers to verify the source of the wine by reading the reverse side of the Marilyn Monroe label.  This factor therefore favors plaintiff.

6. Defendant's Intent in Selecting the Mark

The next Sleekcraft factor directs the court to consider defendant's intent in selecting the Marilyn Wines trade dress.  Because courts assume that a defendant who intentionally attempts to confuse consumers will in fact succeed in doing so, evidence of such an intent is probative of likelihood of confusion.  Playboy Enters., Inc. v. Netscape Commc'ns Corp., 354 F.3d 1020, 1028 (9th Cir. 2004) (citing Sleekcraft, 599 F.2d at 348 n.9).  On the other hand, while good faith "may be given considerable weight in fashioning a remedy," it is only marginally probative of absence of consumer confusion.  Sleekcraft, 599 F.2d at 354; see also Golden Door, Inc. v. Odisho, 646 F.2d 347, 351 (9th Cir. 1980).

18

1       The communications between the parties in summer 2006 are instructive in this regard.

2   When plaintiff first learned that Adler Fels was marketing a wine bearing a photograph from the Red

3   Velvet Collection, plaintiff's broker contacted Adler Fels and informed them that plaintiff was the

4   exclusive licensee of the Monroe estate.  Reading Dec. ¶ 3; Lindsay Dec. ¶ 5.  Shortly thereafter,

5   counsel for Nova Wines informed Adler that "no one else" besides plaintiff had "the right to produce

6   wines [bearing Marilyn Monroe's] likeness," and that plaintiff would "aggressively protect" its

7   rights.  Lindsay Dec. ¶6, Exh. 13.  Counsel representing Adler, TKS and Pacific responded the

8   following day, expressing skepticism that plaintiff had exclusive rights to use Marilyn Monroe's

9   name and likeness for all wines, and stating that Adler Fels would not "succumb to [Nova's]

10  threats."  Id. ¶ 7, Exh. 14.  A review of this correspondence reveals that the discussion centered

11  around the contractual rights of each party to use the Marilyn Monroe images, rather than any

12  specific mention of trademark, trade dress, or consumer confusion.  Plaintiffs make no showing that

13  defendants' intention in using the images was to capitalize on plaintiff's established trade dress or

14  otherwise create consumer confusion.  This factor therefore favors defendants.

15

16              7.      Evidence of Actual Confusion and Likelihood of Expansion

17      Plaintiff claims that the final two factors—evidence of actual confusion and likelihood of

18  expansion into competing product lines—bear little weight in this case, and the court agrees.

19  Because Adler Fels has not yet begun to sell its Red Velvet Collection wines, actual consumer

20  confusion is necessarily limited, if it exists at all.  Furthermore, the expansion factor is irrelevant

21  because Nova and Adler Fels are already direct competitors.

22

23              8.      Weighing the Sleekcraft Factors

24      In summary, the court finds the following Sleekcraft factors weigh in favor of plaintiff: the

25  similarity of the trade dresses, the strength of the Marilyn Wines trade dress, the relatedness of the

26  parties' goods, and the degree of care likely to be exercised by purchasers of the parties' products.

27  Although the intent in choosing the trade dress weighs in favor of defendant, lack of intent is of little

28  probative value in assessing likelihood of confusion.  The remaining factors are of little importance

19

1   under the circumstances and do not favor either party.  Because all of the probative factors,

2   including the all-important similarity factor, weigh in favor of plaintiff, the court finds that plaintiff

3   has established by a preponderance of the evidence that it will able to prove a likelihood of

4   consumer confusion at trial.

5          This does not end the inquiry as to likelihood of success on the merits, however, as

6   defendants have raised a number of specific defenses that remain to be considered.  Essentially,

7   defendants claim on several grounds that they have a superior right to use the Red Velvet Collection

8   images on wine labels, and this right cannot be defeated by trade dress protection.

9

10         E.     TKS's Claims to Superior Rights in the Marilyn Monroe Image

11         Defendants assert that TKS owns copyrights in the Red Velvet Collection images, and

12   plaintiff's trade dress interests cannot prevent TKS from licensing its copyrighted works to Adler

13   Fels for the use on wine labels.  This case therefore presents a conflict between two asserted

14   intellectual property rights: Nova's trade dress and TKS's copyright.  The issue is whether plaintiff's

15   trade dress rights can prevent TKS from exploiting its copyright by licensing images for use on wine

16   labels.  While the parties cite to no cases addressing this specific intersection between copyright and

17   trade dress, the Federal Circuit has found that service mark registration does not give the owner of

18   the mark the right to infringe another's copyright.  Boyle v. United States, 200 F.3d 1369, 1373

19   (Fed. Cir. 2000).  In Boyle, a copyright owner challenged the government's failure to cancel a

20   competitor's service mark registration which, according to the copyright owner, effectively

21   destroyed his copyright.  Id. at 1372.  Although the court declined to reach the issue on sovereign

22   immunity grounds, the court noted that while a "grant of a service mark registration entitles the

23   registrant to certain rights and privileges under the Trademark Act [citations], the right to infringe

24   another's copyright is not one of those rights."  Id. at 1373.  The court therefore held that, as a matter

25   of law, "the government's issuance of a service mark registration . . . cannot be construed as either

26   authorization or consent for it to infringe Boyle's copyright," and that "possession of a service mark

27   is not a defense to infringement of a valid copyright."  Id. at 1373–74.  A complementary conclusion

28   is that a valid copyright does not entitle the copyright holder to infringe another's trade dress rights.

20

UNITED STATES DISTRICT COURT
For the Northern District of California

1    This is particularly true where, as here, the plaintiff's trade dress rights are considerably broader

2    than the defendants' copyright interests at issue. Nova has developed a unique trade dress, over a

3    substantial period of time, comprising the use of Marilyn Monroe's name and image on wine labels.

4    The trade dress interest therefore covers all images of Marilyn Monroe used on wine labels. These

5    rights are broader than TKS's copyright interests in the specific images comprising its Red Velvet

6    Collection. Plaintiff's trade dress rights therefore entitle it to prevent TKS from exercising the

7    narrow portion of its copyright interests consisting of licensing images of Marilyn Monroe for use

8    on wine bottles.

9        Similarly, defendants claim that their intended use of the Red Velvet Collection images is

10   authorized by a model release signed by Marilyn Monroe before her death. Plaintiff states that it

11   contests the validity of this model release "for a number of reasons," none of which are delineated.

12   Wegner Dec. ¶ 6. It is not clear whether this model release is being contested in any other

13   proceedings involving these parties. In any case, any rights granted to TKS by the model release

14   would be no stronger than its copyright interests in the Red Velvet Collection photographs. Because

15   TKS's copyright cannot defeat plaintiff's trade dress, the model release is similarly unavailing.

16       In addition to these specific rights, defendants assert that the Marilyn Monroe estate itself has

17   no valid rights of publicity to assign to plaintiff, and any rights of publicity that may exist are

18   preempted by TKS's copyrights. Marilyn Monroe's purported rights of publicity are currently the

19   subject of ongoing litigation in several states, including, according to defendants, Marilyn Monroe's

20   probate proceeding which has been open since her death in 1962. Given the fact that the instant

21   action involves trademarks and trade dress, rather than the right of publicity, the court is not

22   persuaded of the relevance of defendants' argument. The court therefore declines to wade into the

23   murky waters surrounding the estate's purported rights of publicity.

24       Finally, defendants assert that, under the terms of the licensing agreement between TKS and

25   plaintiff, plaintiff was prohibited from acquiring any rights in the Red Velvet Collection images

26   based on its use of the images on its wine labels. Again, the court is hesitant to interpret the

27   licensing agreement while the separate arbitration between TKS in Nova is pending. Nonetheless,

28   the court finds that this argument is without merit. Plaintiff's trade dress interest does not arise from

1   its license or use of the Red Velvet Collection images.  Rather, the trade dress interest in placing

2   Marilyn Monroe images on wine labels was in place before plaintiff licensed the Red Velvet

3   Collection images from TKS.  While securing copyright licenses for various Marilyn Monroe

4   images was necessary to develop the trade dress over time, by the time plaintiff secured its copyright

5   license from TKS the trade dress was well-established.  The specific May 2004 license was a means

6   of adding another Marilyn Monroe wine to plaintiff's existing line of products.  It did not create a

7   new trade dress out of whole cloth that TKS was entitled to acquire under the licensing agreement.

8   　　　　Accordingly, defendants' claim to superior rights in the Red Velvet Collection photographs

9   for use on wine labels is unconvincing.  Because plaintiff has asserted a valid trade dress inference

10  and shown a likelihood of confusion, the court finds that plaintiff has demonstrated a likelihood of

11  success on the merits.  "Once the plaintiff has demonstrated a likelihood of confusion, it is ordinarily

12  presumed that the plaintiff will suffer irreparable harm if injunctive relief is not granted."

13  Brookfield Commc'ns., 174 F.3d at 1066.  Plaintiff is therefore entitled to injunctive relief.

14

15  II.　　Balance of Hardships

16  　　　　While plaintiff's demonstration of likelihood of confusion is sufficient to warrant injunctive

17  relief, the court further finds that injunctive relief is warranted under the Ninth Circuit's alternative

18  test: serious questions going to the merits of the case combined with the balance of hardships tipping

19  sharply in favor of the plaintiff.  Southwest Voter Registration Educ. Project, 344 F.3d at 917.  As

20  the sole purveyor of Marilyn Monroe wines for the past twenty years, plaintiff may suffer

21  immeasurable and irreparable damage to its reputation and goodwill if other wineries are able to sell

22  wines with nearly identical packaging outside the control of plaintiff.

23  　　　　In contrast, defendants have made very little showing of hardship should an injunction issue.

24  Defendants claim that they will suffer irreparable harm through loss of "market time," injury to

25  reputation by being unable to follow through with its planned introduction of its Marilyn Monroe

26  wines, and a negative perception in the marketplace as an infringer without proof that plaintiff has

27  any rights or that defendants have violated those rights.  Defendants assert that they will suffer

28  financial losses in excess of $4 million should an injunction issue, based on their inability to fill

22

1    orders and exploit "initial publicity and buzz" in time to make holiday season sales.  Lindsay Dec.

2    ¶¶13–14; Saal Dec. ¶ 21.  Defendants offer no data to support this figure.

3          Defendants cite cases in which parties suffered harm by being forced to withdraw their

4    products or were effectively shut down by the injunction.  Illinois Tool Works, Inc. v. Grip-Pak,

5    Inc., 906 F.2d 679, 683 (Fed. Cir. 1990); Flotec, Inc. v. Southern Research, Inc., 16 F. Supp. 2d 992,

6    1012 (S.D. Ind. 1998).  Defendants seem to ignore the crucial fact that Adler Fels' product has not

7    yet been released into the market place.  There are thus no products to withdraw, and it is unlikely

8    that defendants will be "shut down" by being temporarily prevented from releasing a particular

9    product.  Notably, defendants have offered no explanation as to why they cannot simply use a

10   different, clearly non-infringing label for the particular wine they have chosen as their Red Velvet

11   Collection wine.  As there can be no possible relationship between the image of Marilyn Monroe

12   and the flavor of the wine, that which we call Marilyn Monroe wine, by any other name, would taste

13   as sweet.  See William Shakespeare, Romeo and Juliet, act 2, sc. 2.  In addition, Adler Fels has been

14   in the business of selling wine under a wide variety of names and labels.  Given the large number of

15   unclaimed names and images that Adler Fels could select for its wines, it is difficult to see how

16   Adler Fels' business will be adversely affected by being barred from using the name or image of one

17   particular individual.

18         Finally, defendants claim that plaintiff's delay in filing its TRO application and motion for

19   preliminary injunction militate against granting a preliminary injunction.  The court does not find

20   undue delay here.  Although the initial controversy erupted in June or July 2006, plaintiff did not

21   learn that Adler Fels was actually marketing its upcoming Red Velvet Collection wine until

22   September, and the earlier communications between the parties did not indicate that Adler Fels

23   would be selling such a wine.  Plaintiff served its complaint, TRO application, and motion for a

24   preliminary injunction, the following month.  This time frame was reasonable and therefore does not

25   bar injunctive relief.

26         Accordingly, the court finds that the balance of hardships tips sharply in plaintiff's favor.

27

28

CONCLUSION

For the reasons stated above, the court GRANTS plaintiff's motion for a preliminary injunction.

IT IS SO ORDERED.

Dated:        Dec. 1, 2006

_____

MARILYN HALL PATEL
District Judge
United States District Court
Northern District of California

24

**ENDNOTES**

1. Defendants have cited authority indicating that the image or likeness of a famous individual, standing alone, cannot be protected as a trademark. Plaintiff does not appear to contest that such "in gross" protection is not available, but rather argues that it seeks protection for the use of Marilyn Monroe's image and likeness on wine bottles only. Accordingly, the protectable interest in Marilyn Monroe's image is better assessed in the context of trade dress, discussed *infra*.

2. Defendants do not argue that plaintiff lacks standing to bring claims under Section 43(a) of the Lanham Act (15 U.S.C. section 1125(a)) for common law trademarks, and it appears that plaintiff clearly has standing under this provision. See, e.g, Halicki v. Carroll Shelby Int'l, Inc., No. CV 04-8813 SJO, 2005 U.S. Dist. LEXIS 28214, at *32 (C.D. Cal. Nov. 11, 2005) (holding that "the question of ownership is immaterial to standing," and that to maintain a Section 1125(a) claim a plaintiff "must show that it has a commercial interest in the allegedly misused mark that is likely to be damaged").

3. Because plaintiff lacks standing to bring claims based on the "Marilyn Monroe" trademark, the court does not reach defendants' argument that their use of the "Marilyn Monroe" trademark constitutes fair use.

4. Defendants also point out that neither plaintiff nor the Marilyn Monroe estate ever identified the images of Marilyn Monroe as trademarks by designating them with the "TM" indicator. This argument is without merit regarding the trade dress claim, however, as the specific images of Marilyn Monroe need not be trademarked in order to give rise to trade dress protection.

5. According to the exhibits submitted with the Holder Declaration, plaintiff used the same photo of Marilyn Monroe on its 2002 and 2004 releases.

25